UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **RUBY PRESTON,** § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | **CIVIL ACTION NO. H-05-0334** |
| § | |
| **TEXAS DEPARTMENT OF FAMILY** § | |
| **AND PROTECTIVE SERVICES,** § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Pending before the Court in this racial discrimination case is Defendant's motion for summary judgment. After considering the parties' filings and the applicable law, the Court finds that the motion, Docket No. 20, should be and hereby is **GRANTED**.

### I.     BACKGROUND

Plaintiff Ruby Preston was hired by Defendant Texas Department of Family and Protective Services ("TDFPS") in 1990. In late 2001, Preston, who is African American, began working under the supervision of Program Director Krista Rodriguez. Preston and Rodriguez worked well together throughout the remainder of 2001 and most of 2002, and Preston received positive evaluations for both years. In October 2002, however, Preston reported to Rodriguez that other workers were complaining that Dory Allen, a Caucasian supervisor under Rodriguez's control, was discriminating against African American workers.

Preston contends that she began receiving negative performance evaluations after reporting the alleged discrimination to Rodriguez. She also claims that she was denied leave and overtime pay to which she was entitled; was assigned more work than she

1

could perform in the time allotted; was criticized for failing to meet the unrealistic deadlines imposed upon her; and was not, unlike other workers at her level, permitted to act as a supervisor during her superiors' absences. She asserts that Caucasian employees were not similarly overworked, missed deadlines with impunity, and were allowed to act as temporary supervisors. In June 2003, Preston was placed on a corrective action plan and cited for violation of TDFPS Standards of Conduct #4 and #5, which require employees to meet the department's standards of performance and to follow supervisors' job-related instructions. (*See* Def.'s Mot. for Summ. J., Ex. A-17, at 2.)

In January 2004, Preston filed an internal administrative complaint against Rodriguez, citing an unreasonable workload and hostile treatment based, *inter alia*, on her race. (*Id.*, Ex. A-1.) The TDFPS investigated the complaint and determined that it was unsubstantiated, finding specifically that "there is no information to support [a finding of] racial discrimination regarding casework practices." (*Id.*, Ex. A-2.) The administrative report noted that Preston had a reputation as a difficult employee:

> Information describes Mrs. Preston's approach as she interacts with caseworkers and supervisors in her assigned program, tends [sic] to undermine the supervisor's authority in the unit and tends to promote negativism among the staff, particular[ly] with relatively new caseworkers. Information also describes Mrs. Preston complains [sic] frequently about her assignments and she displays a false sense of authority. Mrs. Preston has told staff in her program that she is "second in command" when the Program Director is not in the office, which[,] in turn, is a direct conflict [with] the orders given to her by Ms. Bella Alex, Program Administrator.

(*Id.*)

On Friday, April 23, 2004, Preston was working as the "on-call" caseworker for child death cases. At 9:00 p.m. that evening, she received a Priority 1 referral, a case involving a family with two children, a three-month-old infant and a sixteen-month-old

2

toddler. The mother had brought the infant to the hospital, where it was found to have died of massive internal injuries, including organ damage and old and new rib fractures. The nonverbal sixteen-month-old was uninjured and was permitted to leave the hospital with the mother.

A Priority 1 investigation must include an interview and examination of the child, at least one parent, and the alleged perpetrator (in this case, the father, whose whereabouts were unknown on the evening of April 23), and must commence within twenty-four hours of assignment. (*See id.*, Ex. B; Def.'s Mot. for Summ. J., Ex. A-6, at 3.) TDFPS regulations provide that the TDFPS and law enforcement are to conduct joint investigations of all Priority 1 referrals involving allegations of physical or sexual abuse. (Def.'s Mot. for Summ. J., Ex. A-6, at 8.) In such a case, the TDFPS case worker must contact the Houston Police Department ("HPD") dispatcher, who then contacts the police officer(s) assigned to the case and instructs them to confer with the TDFPS worker. (*Id.*, Ex. A-3.)

In this case, the TDFPS Risk Director, Jennifer Williams, determined that an immediate risk assessment must be performed on the surviving sibling. Preston called the hospital where the family had been treated but was informed that the mother and surviving child had already left, accompanied by law enforcement, to go to the home of relatives. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7.) Preston then called the HPD homicide unit and left voice mail messages for each of the two HPD officers assigned to the case. (*Id.*) She did not contact the HPD dispatcher. (*Id.*)

Over the weekend, Preston made two visits to the family's home but found the residence empty both times. She has admitted that she did not expect to find the family at

home, and she did not wear professional attire on these visits, as required by TDFPS policy. (*See* Def.'s Mot. for Summ. J., Ex. B, at 34, 36-37; *id.*, Ex. A-5, at 3; Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. A-11, at 1-2.) She also attempted, on Saturday, April 24, 2004, to contact the HPD officers assigned to the case but was informed that they were off-duty for the weekend. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 8.) On Monday, April 26, at approximately 4:00 p.m., Preston reached one of the officers, who informed her of the whereabouts of the mother and surviving child. (Def.'s Mot. for Summ. J., Ex. A-7, at 5.) Preston called the home of the family members with whom the mother was staying and learned that the mother and child were not presently at the home. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7-8.) She finally made contact with the mother on Tuesday, April 27, 2004, and took the surviving child into custody. (Def.'s Mot. for Summ. J., Ex. A-7, at 5.)

Also in late April 2004, the grandmother of children involved in another of Preston's cases complained to TDFPS that Preston had left a disrespectful and threatening voice mail message. (*Id.*, Ex. A-5, at 4-5.) Rodriguez and the Program Administrator, Bella Alex, listened to the recording and found the message to be discourteous and in violation of the TDFPS standards of conduct. (*Id.*) When questioned about the message, Preston maintained that she had acted properly. (*Id.*, Ex. A-5, at 5.) The conflict that resulted from the message cause the TDFPS to terminate Preston's involvement with the case. (*Id.*)

On April 29, 2004, Preston was assigned another Priority 1 case. (*Id.*) She failed to make contact with the alleged victim until the following day, despite the twenty-four-hour contact deadline. (*Id.*) When Rodriguez asked how the case had been handled,

4

Preston replied that she had worked on it with supervisor Dorothy Oakes. (*Id.*) That statement turned out to be untrue. (*Id.*)

Preston filed a second administrative complaint against Rodriguez the following month, complaining of retaliation for her earlier complaint. (*Id.*, Ex. A-4.) Preston alleges that the TDFPS never investigated this report. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5.) On June 9, 2004, Rodriguez and Alex recommended that Preston's employment be terminated as a consequence of her violations of TDFPS rules. (Def.'s Mot. for Summ. J., Ex. A-5.) Specifically, Rodriguez and Alex accused Preston of violating Work Rule 2, which requires each employee to perform her job duties, meet performance standards, and follow supervisors' job-related instructions; Work Rule 3, which requires each employee to avoid behaving in a way that is distracting or disruptive to other workers; Work Rule 5, which requires each employee to exhibit courtesy and respect in all interactions with clients and coworkers; Work Rule 12, which requires each employee to maintain honest and accurate work records; and Work Rule 13, which requires each employee to refrain from making false statements relating to the employee's job duties. (*Id.*)

After reviewing the recommendation and meeting with Preston, Randy Joiner, the TDFPS Regional Director, terminated Preston's employment on June 29, 2004. Preston appealed her termination internally and received a hearing before an administrative law judge ("ALJ"), who upheld the dismissal after finding that Preston had violated Work Rules 2, 5, 12, and 13. (*Id.*, Ex. D.) Preston timely filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue

letter. She subsequently filed the instant suit, alleging race discrimination and retaliation[1] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## II.     ANALYSIS

### A.     Legal Standards

#### 1.     Summary judgment standard.

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 4777 U.S. 317, 322 (1986) (internal quotation marks omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255.

#### 2.     Title VII standards.

"Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[1] This Court has dismissed Preston's allegation of age discrimination. (*See* Memorandum and Order dated June 7, 2005 (Docket No. 12).)

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of [retaliation]. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Frank v. Xerox Co.*, 347 F.3d 130, 137 (5th Cir. 2003). To establish a *prima facie* case of discrimination, a plaintiff must provide evidence that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." *Okoye v. Univ. of Texas Houston*, 245 F.3d 507, 512-13 (5th Cir. 2001) (internal quotation marks omitted).

For the purposes of a Title VII discrimination claim, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762.

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are also subject to the *McDonnell Douglas* burden-shifting standard. "A plaintiff establishes a *prima facie* case for unlawful retaliation by proving (1) that she engaged in activity protected by Title VII, (2) that an

7

adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). The Supreme Court has recently held that the anti-retaliation provision of Title VII is broader than the anti-discrimination provision and, accordingly, that a retaliation claim may arise from any action that a reasonable employee would find materially adverse, "which[,] in this context[,] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (June 22, 2006) (internal quotation marks omitted).

"In order to establish the causal link between the protected conduct and the illegal employment action as required by the *prima facie* case, the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). A plaintiff may establish causation by *either* direct *or* circumstantial evidence. *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 191-92 (5th Cir. 2001). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

### B.    Preston's Claims

In evaluating Preston's Title VII claims, the Court may consider only those allegations set forth in Preston's EEOC charge or assertions reasonably related to those allegations. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 711 (5th Cir. 1994). In her EEOC charge, Preston complained that she was subjected to two

written "admonishments" and then terminated because of her race and in retaliation for her complaints of racial discrimination.[2] (Def.'s Mot. for Summ. J., Ex. E.) For the purposes of Preston's discrimination claim, only the termination may be considered an adverse employment action. *See, e.g.*, *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995) ("Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."). For the purposes of the retaliation claim, the Court may consider the written admonitions, as well as the termination, to be materially adverse employment actions if they would have dissuaded a reasonable employee from complaining of discrimination. *Burlington Northern*, 126 S. Ct. at 2415.

Preston has established the first three prongs of a *prima facie* case of both discrimination and retaliation by showing that (1) she is African American and, thus, a member of a protected class; (2) she was qualified for the position that she held; and (3) she was terminated. The TDFPS argues, however, that Preston has failed to satisfy the fourth prong. Preston contends that she has established disparate treatment by showing that Caucasian workers engaged in the same patterns of behavior of which she was accused but were not terminated.

"To establish a claim of disparate treatment, [a plaintiff] must show that [the employer] gave preferential treatment to [another employee not belonging to the suspect class] under 'nearly identical' circumstances." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (quoting *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.

---

[2] Preston's Complaint and response to the summary judgment motion also discuss Rodriguez's alleged harassment and mistreatment of Preston before her termination. These assertions are, however, not closely related to the termination claim, which is the only claim as to which Preston has properly exhausted her administrative remedies. Accordingly, the Court declines to consider those allegations in analyzing the motion for summary judgment.

1990)).  According to the TDFPS, Preston cannot satisfy this requirement, because she was the only worker at her level who was supervised by Rodriguez – because, that is, no other worker was similarly situated to Preston.

The Fifth Circuit has held that employees disciplined by different decision makers are not "nearly identically situated" for the purposes of Title VII.  *See, e.g.*, *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2000) ("Most importantly, the decision-makers who disciplined Waldrop differed from those who were charged with deciding what action to take against Burks.").  In this case, however, Preston's termination was recommended not only by Rodriguez but also by Bella Alex, the Program Administrator, who oversaw other workers with Preston's job description.  (*See* Def.'s Mot. for Summ. J., Ex. A-5, at 7.)  Moreover, the final termination decision was made by the Regional Director, Randy Joiner, and not by Rodriguez.  Accordingly, the Court finds that Preston may prove disparate treatment by demonstrating that she was treated differently than other workers in her classification who worked under the supervision of Bella Alex and/or Randy Joiner and were otherwise similarly situated.

Preston has not, however, made such a showing.  Although both her Complaint and her response to the TDFPS's summary judgment motion are rife with generalizations about the preferential treatment accorded to Caucasian workers, the Complaint fails to specify even one instance in which a particular Caucasian worker received such treatment.  The summary judgment response does include several such allegations, but none of them involves a nearly identically situated worker.

First, Preston states in the response that "Krista Rodriguez and other white employees missed deadlines."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 3.)  Rodriguez

was not, however, one of Preston's peers; she was, rather, a supervisor, with a job description very different from Preston's.  Next, Preston notes that "Shannon Manning, white, testified at the grievance hearing that she worked as an acting supervisor, that she never had a subcase caseload with 30 cases[,] and that she never worked back to back caseloads."  (*Id.*)  This information, even if true, was not included in the EEOC charge and therefore cannot be considered by this Court.

Also, according to Preston, "Bridgett Dawson, white, had some disciplinary actions[,] and Krista Rodriguez did not recommend that she be terminated."  (*Id.* at 5.) Even if Rodriguez's recommendation constitutes an adverse employment action for purposes of Preston's retaliation claim,[3] however, Preston does not demonstrate that she and Dawson had the same job description or that Dawson was disciplined for the same reasons as, or similar ones to, those that led to Preston's termination.  Accordingly, the Court cannot find that Dawson and Preston were "nearly identically" situated.

Finally, Preston states that "[a] white employee, Stephanie Hammond, did not make contact with a family for five days" in a child death case with a surviving sibling, and was not terminated.  (*Id.* at 8.)  Preston has been unable to adduce evidence in support of this assertion and admits that it may have originated in "gossip around the office."  (*Id.*, Ex. D, at 47 (Preston Dep. at 184:2-4).)  She is unaware of the details of the case and has indicated that her belief that Hammond did not contact the family within five days is based upon an assumption:

> Q: Okay.  Do you know of any white employee that failed to make contact on a child abuse case for a child death case where there was a child sibling that for five days that there were no consequences for that?

---

[3] It cannot do so for her discrimination claim, since Joiner made the ultimate decision to terminate her employment.

11

>A: Stephanie Hammond.
>
>Q: Stephanie Hammond?
>
>A: Yes.
>
>Q: Who did she work for?
>
>A: She worked under Edith Holloway as her Worker V.
>
>Q: And is that in Bella Alex's program as well?
>
>A: I believe so, but I'm not real sure.
>
>Q: And what were the circumstances of that child death case?
>
>A: I have no idea.  All I heard is that the family flew back to Mexico – left for Mexico.  That's what I heard, so *she couldn't have possibly made contact within five days.*
>
>Q: Did she get in touch with law enforcement within the five days?
>
>A: I have no idea about the rest of the investigation.  I have – that's information that I'm sure they wouldn't want me to have at that point in time, so I have no idea about anything else on that case.
>
>Q: Have you talked to Stephanie Hammond?
>
>A: No, I have not.

(*Id.*, Ex. D, at 47 (Preston Dep. at 182:19-183:20) (emphasis added).)  Because there is no reliable evidence reflecting what actually occurred in the case to which Preston refers, and because she has made no showing that Hammond was accused of the other rule violations for which Preston was cited, the Court finds that Hammond is not similarly situated for the purposes of Title VII.  Accordingly, Preston has failed to establish a *prima facie* case of disparate treatment discrimination.[4]

---

[4] Preston's summary judgment response also asserts that she is "more qualified that white Worker V's . . . . J. Melissa Gauthier and Stephanie Hammond."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6.)  The response makes no allegation, however, that either employee was accorded preferential treatment (or,

Even if Preston could make a *prima facie* case of discrimination or retaliation, the TDFPS has articulated a legitimate, non-discriminatory reason for the admonitions and termination; namely, Preston's violation of numerous TDFPS rules and her repeated failure to perform her work, including Priority 1 investigations, in a timely fashion. The burden therefore shifts back to Preston to demonstrate that the articulated reason is a mere pretext for discrimination. Preston attempts to satisfy this requirement by arguing that she was treated differently from Caucasian workers and never received any warnings or progressive discipline before being terminated.

Preston's first contention must fail, as it seeks to satisfy Preston's ultimate burden by relying upon the *prima facie* case (assuming, *arguendo*, that she has made such a case in the first instance). At the final stage of the *McDonnell Douglas* test, a plaintiff must show not only that she was differently treated but also that the reason for the disparity is racial animus or a desire to retaliate. And Preston's assertion that she was not warned or disciplined prior to her termination is belied by her own repeated references to the negative performance reviews that she received throughout the year prior to her firing. (*See, e.g.*, *id.* at 2 ("All of the conference notes that Plaintiff received from Krista Rodriguez were negative after she reported the allegations of racial discrimination."); *id.* at 3 ("Plaintiff was criticized when she did not meet the unreasonable deadlines."); *id.* at 4 ("Defendant's Exhibit A-17 was the first performance evaluation Plaintiff received after Plaintiff reported the allegations of racial discrimination and the first time she had received an 'unsuccessful' rating."); *id.* at 5 ("From January 1, 2003 until Plaintiff was discharged all of the conference notes she received from her supervisor did not have

---

indeed, any kind of treatment at all). Accordingly, the statement is irrelevant to the summary judgment analysis.

anything positive in them about Plaintiff's work performance."); *id.* at 6 ("After Plaintiff returned from a two week vacation she was put on a Corrective Action Plan immediately."); *id.* at 14 ("Plaintiff's supervisor discriminated against her by . . . preparing performance reviews that did not represent Plaintiff's performance and humiliated Plaintiff.").)

Because, therefore, Preston has failed to establish a *prima facie* case of discrimination or retaliation in violation of Title VII and, assuming that a *prima facie* case had been established, cannot demonstrate that the TDFPS's asserted legitimate, non-discriminatory reason for the admonitions and termination is a mere pretext for discrimination, summary judgment is **GRANTED** for the TDFPS on Preston's Title VII claims.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 9th day of August, 2006.

_/s/ Keith P. Ellison_

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**